Sergio MARTINEZ, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1256.

District of Columbia Court of Appeals.

Argued Oct. 19, 2000.

Decided Nov. 30, 2000.

Manuel Rivera, Washington, DC, appointed by the court, for appellant.

John M. Cummings, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Michael T. Ambrosino, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, STEADMAN, and GLICKMAN, Associate Judges.

TERRY, Associate Judge:

After a jury trial, appellant was convicted of assault on a police officer while armed and carrying a dangerous weapon (knife). His only contention on appeal is that the court erred in failing to impose sanctions on the government for its inability to produce the knife at trial. We affirm.

I

Detective Charles Bonilla testified that on April 12, 1996, in the early evening, he had stopped in a small market on Park Road, N.W., to get something to eat when he was paged by his wife. He went outside and called his wife on a pay phone in front of the store. As he was talking to her, Bonilla noticed a man—"appellant Martinez"—standing nearby and staring at him. Bonilla at first paid him no attention but continued his conversation. After a few moments, however, Bonilla noticed Martinez walking toward him with a beer bottle in his left hand and a "large knife," about eight inches long, in his right hand. The knife was partially concealed by the way that Martinez was holding it, with the point toward his armpit, but Detective Bonilla could clearly see that it·was a knife. Bonilla immediately dropped the phone, drew his service revolver, pointed it at Martinez, and said to him (in Spanish), "I'm the police, drop the knife." Bonilla also displayed his badge. Martinez, however, continued walking toward him and said, "I don't care if you are the police." Bonilla kept repeating in a loud voice, "I'm the police, please throw the knife down," and a bystander also said (in Spanish), "Drop the knife, he's a police officer," but Martinez held on to the knife. After a couple of minutes, during which Martinez began to twirl the knife in his hand, he "made a sudden movement" with the knife toward Detective Bonilla. Martinez was "gripp[ing] the knife hard," and the blade was turned toward Bonilla. Fearful for his life,[1] Bonilla fired his gun once toward Martinez. The bullet struck Martinez in the chest, and he dropped the knife and fell to the ground. He was later taken to a hospital and treated for his wound.

---

1. Bonilla testified, "I was scared for my safety. I felt my life was in danger at that time," even though he had "tried very hard to convince the defendant to drop the knife."

Detective Bonilla's testimony was corroborated by Iris Compres, the cashier in the store where Bonilla had stopped to have supper. Ms. Compres knew him from his regular visits to the store ("in this store many policemen come to eat"). She testified that from inside the store she heard Detective Bonilla yelling in a loud voice, "Drop the knife, I'm a policeman." When she went outside, she saw Bonilla pointing his service revolver at a man with a knife in his hand, pointed upward. Another man, whom she knew only as Cesar, was saying, "He's a policeman, drop the knife." [2] Bonilla too kept repeating his command to "drop the knife" and his statement, "I'm a policeman." The man with the knife was also saying something, but Ms. Compres could not hear what it was. Then she heard a "boom," and the man dropped the knife on the ground.

Officer Larry Johnson, a crime scene search officer, testified that he recovered the knife and dusted it for fingerprints, but found none that were usable. His description of the knife on a police property form matched the description given by Detective Bonilla in his testimony. The knife was not produced at trial because, shortly before the trial began, a fire had damaged a computer at the police warehouse where it was kept. The computer contained the only record of its location within the warehouse; consequently, the knife could not be located in time to bring it to court, even though a physical search of the warehouse was conducted and, according to Officer Johnson, was still ongoing at the time of trial.

The defense theory was that Detective Bonilla accidentally shot Mr. Martinez, and that in order to cover up his blunder, the police planted a knife at the crime scene. That knife was later intentionally lost, according to this theory, so that it could not be examined and tested by the defense. The only defense witness was a self-employed forensic consultant, who testified as an expert. His testimony highlighted certain inconsistencies between Officer Johnson's crime scene search report and a photograph which showed the knife lying on the ground. Martinez did not testify.

The trial court gave a missing evidence instruction [3] at defense counsel's request. The court expressed some doubt that there was sufficient foundation for the instruction in the evidence, but agreed to give it because the government did not object.

## II

Martinez contends that the trial court should have sanctioned the government for its failure to produce the knife. His argument is based on Super. Ct.Crim. R. 16, which governs discovery in criminal cases, and on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

This case was originally set for trial on September 25, 1996, but it was continued six times, for various reasons, until May 28, 1998, when the trial finally began. The record shows, however, that shortly before the first scheduled trial date in September 1996 defense counsel sent the prosecutor a detailed written request for discovery, and that a discovery conference was held in October 1996, at which the prosecutor disclosed or made available to the defense various evidentiary items. It is undisputed that defense counsel was well aware of the existence of the knife as early as September 1996,[4] and it does not appear that

2. Cesar was not further identified and did not testify. His statement was admitted as an excited utterance.

3. *See* Criminal Jury Instructions for the District of Columbia, No. 2.41 (4th ed.1993).

4. Defense counsel's letter to the prosecutor, dated September 23, 1996, said in part, "I understand that the government does have some tangible items in its possession or control obtained after the arrest ... [including] a knife...."

In another letter to the prosecutor, dated November 22, 1996, defense counsel acknowledged that he had received what he described as a "viewing letter of the evidence and photos of the crime scene ... on or about November 15, 1996." Although the "viewing

the prosecutor made any effort to hinder counsel's access to the knife. It is also abundantly clear from the record that defense counsel made no attempt to see the knife or to have it examined by an expert of his choosing at any time between September 1996 and the beginning of trial in May 1998, a period of more than twenty months.

■ Rule 16(a)(1)(C) provides in pertinent part:

> Upon request of the defendant, the prosecutor shall permit the defendant to inspect ... tangible objects ... which are within the possession, custody, or control of the government, and which are material to the preparation of the defendant's defense....

In the circumstances presented here, we are satisfied that the government met its obligation under Rule 16 to give the defense access to—*i.e.,* "permit the defendant to inspect"—the knife. While it is true that the government has a continuing duty to preserve discoverable evidence, *see United States v. Bryant,* 142 U.S.App. D.C. 132, 141, 439 F.2d 642, 651 (1971),[5] we can find no violation of that duty here. The fire which incapacitated the computer at the police warehouse made the knife temporarily unavailable, but that appears to have been an unfortunate accident. Martinez's contention on appeal is that if the knife had been available to him earlier, he could have subjected it to various scientific tests which could have substantiated his defense. Assuming that there were such tests which might have been helpful,[6] they could have been conducted at any time between September 1996 and the fire that occurred in May 1998, a day or two before trial. The government cannot be

blamed for defense counsel's failure to take any steps to have the knife tested during that twenty-month period.

We note, in addition, that the only sanction specifically requested by Martinez at trial was a missing evidence instruction, which the trial court gave. Martinez now argues that the court should have imposed additional sanctions, but he does not tell us what those sanctions should have been. The government maintains that Martinez must demonstrate plain error before he can prevail on this argument. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Sheffield v. United States,* 397 A.2d 963, 968 (D.C.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979) (trial court's failure to impose a sanction *sua sponte* for failure to preserve discoverable material, after defense fails to request a sanction, will only be reversed upon a finding of plain error). Martinez responds that he did indeed request an additional sanction, namely, exclusion of the photograph which showed the knife lying on the ground.

■ It is true that defense counsel did ask the court to exclude the photograph, but it is not entirely clear that this request was intended as a sanction for the government's failure to produce the knife. Martinez asserts that it was; the government says it was not. Even assuming that it was, we agree with the government that the exclusion of the photograph could not have helped the defense. As the government points out in its brief, the defense claimed that the knife was planted by Detective Bonilla. "Thus the picture of the knife simply portrayed an uncontested fact—the presence of the knife at the

---

letter" itself is not in the record, there appears to be no dispute that it authorized defense counsel to inspect the knife and other pieces of evidence upon request.

5. *Bryant* is binding on this court under *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

6. Martinez suggests, for example, that the knife might have been examined again for

fingerprints. Officer Johnson testified, however, that he dusted the knife for fingerprints on the scene, before he turned it over the property clerk, and that he found no usable prints at all. We fail to see how one could expect any additional testing to be any more helpful to the defense than Johnson's testimony.

scene—leaving as the remaining point of contention the question of how the knife got there." Indeed, the photograph was used by the defense expert to impeach the crime scene search report. Since both the decision to impose a sanction and the choice of a sanction are within the discretion of the trial court, *see Sheffield,* 397 A.2d at 968 (citing cases), we find no abuse of discretion in the court's denial of the request to exclude the photograph.

Finally, Martinez makes an argument under *Brady v. Maryland* that the government violated his due process rights when it failed to produce the knife and prevented him from being able to test it for exculpatory evidence. We reject this argument in light of *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), which requires a defendant to show bad faith when claiming a denial of due process based on lost or destroyed evidence. *See United States v. Day,* 697 A.2d 31, 35–36 (D.C.1997) (applying *Youngblood* ); *Cantizano v. United States,* 614 A.2d 870, 873 (D.C.1992) (same). The burden is on Martinez to show both that there was bad faith on the part of the government and that the missing knife was not only material (which we shall assume) but also potentially exculpatory. *See United States v. McKie,* 292 U.S.App. D.C. 419, 423, 951 F.2d 399, 403 (1991). He has made no such showing here. On the latter point, his suggestion that testing the knife might have produced exculpatory evidence is speculative at best. As for the issue of whether there was any bad faith, the trial court did not address it, nor did the defense ask it to do so. The record establishes, however, that the police tried to locate the knife when the case came to trial, but that the computer essential to that task had been rendered inoperative by a fire. A manual search was unsuccessful. In these circumstances we would be hard pressed to conclude that there was any bad faith on the part of the government. We therefore hold, following *Youngblood,* that there is no basis in the record for finding a *Brady* violation.

The judgment of conviction is

*Affirmed.*