## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 30 2019, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Paul J. Podlejski
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Grover McPhaul,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | August 30, 2019<br><br>Court of Appeals Case No.<br>19A-CR-34<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable Angela Warner Sims, Judge<br><br>Trial Court Cause No.<br>48C01-1809-F5-2461 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Grover McPhaul was convicted of two counts of battery resulting in bodily injury to a public safety official, both Level 5 felonies, and one count of criminal mischief, a Class B misdemeanor. The trial court sentenced McPhaul to an aggregate term of six years, with three years executed in the Indiana Department of Correction ("DOC") and three years suspended. McPhaul appeals and raises two issues which we restate as: (1) whether the trial court erred in denying his motion to dismiss due to the State's alleged failure to preserve certain evidence; and (2) whether the trial court abused its discretion by refusing to give the jury an instruction on self-defense. Concluding the trial court did not err in either respect, we affirm.

# Facts and Procedural History

[2] The Madison County Correctional Complex ("MCCC") is a jail overflow facility in Anderson, Indiana, and contains three dormitories where inmates are housed. Each dormitory is comprised of thirty to fifty-one bunks, several long tables with benches, sinks, and a bathroom with an open doorway and walkway. The inmates' meals are served on reusable "big hard plastic" trays, which are placed on a cart and then wheeled into the dormitory area where the inmates line up to receive their meal. Transcript of Evidence, Volume II at 44. Inmates are permitted to eat anywhere in the dormitory. However, once finished, the inmates are required to stack the trays in a specific location. In dormitory two, inmates stack their trays next to the door, which is right next to

the dorm's control room. The control room has a one-way mirror window, control panel, and five monitors displaying live footage of the dorm from several different angles, excluding the interior of the bathroom.

[3] On August 20, 2018, McPhaul was an inmate housed in dormitory two at MCCC. Around 4:58 p.m., Correctional Officer Jared Henderson was inside the dorm's control room when he heard a "thud against the window." *Id*. at 27. To determine the cause of the noise, Officer Henderson rewound the security footage a "short time" and observed McPhaul throw his dinner tray against the window of the control room, behavior that violates MCCC rules. *Id*. at 28. The footage showed McPhaul walked to a sink, proceeded to his bunk, grabbed a roll of toilet paper, and went into the bathroom. After viewing the footage, Officer Henderson requested via radio that McPhaul be removed from the floor. Correctional Officers Nick Robinson and Austin Bentley indicated they would respond.

[4] Upon entering the dorm, the officers were unaware of McPhaul's location. Officer Bentley proceeded toward the bunks while Officer Robinson went straight into the bathroom area. When Officer Robinson entered, he observed "McPhaul getting ready to use the bathroom," so he walked up to McPhaul and asked "if he could cuff up[.]" *Id*. at 47. McPhaul "just blew it off and walked past" Officer Robinson and proceeded to exit the bathroom. *Id*. at 48. To prevent McPhaul from leaving, Officer Robinson grabbed McPhaul's right arm "to secure him in handcuffs[,]" but McPhaul physically pulled away. *Id*. at 49. Officer Robinson attempted to pull McPhaul back toward him. Officer Bentley,

who had been unable to locate McPhaul in the bunk area, went to the bathroom area where he initially observed McPhaul walk ahead of Officer Robinson out of the bathroom and pull away as Officer Robinson tried to get him in handcuffs.

[5] Therefore, Officer Bentley immediately assisted by making contact with McPhaul, and all three fell to the ground in the walkway of the bathroom. A physical struggle to restrain McPhaul ensued. Officer Bentley secured McPhaul's upper body and Officer Robinson attempted to secure his legs; however, McPhaul was "kicking frantic[ally]" and, at some point, drew his arm back as if he intended to punch Officer Bentley. *Id*. at 50. Officer Robinson grabbed McPhaul's arm before McPhaul was able to take a swing. McPhaul took Officer Bentley's glasses from his face and bent them. At some point, McPhaul "started going for [Officer Bentley's] right eye[.]" *Id*. at 78. Officer Bentley testified that he "could feel [McPhaul's] finger . . . applying pressure to . . . [his] right eye." *Id*.

[6] The officers repeatedly ordered McPhaul to roll over on his stomach and place his hands on his back, but McPhaul did not comply and continued to forcibly resist their attempts to restrain him. Officer Garret arrived and delivered a defensive tactic to McPhaul enabling the officers to move McPhaul onto his stomach. Eventually, through the joint effort of the officers, McPhaul was restrained and escorted to an isolation cell. As a result of the altercation, Officer Robinson sustained an abrasion to his face and suffered from a headache, and Officer Bentley had some redness to his right eye.

[7] MCCC Supervisor Mason Brizendine, who had finished his shift at 4:00 p.m. that day, received a phone call notifying him of the incident with McPhaul. The following morning, Brizendine reviewed the incident reports from the officers involved in the altercation, as well as the video footage involving McPhaul. Brizendine recorded the footage of the incident, downloaded the footage from 4:57 p.m. to 5:00 p.m. to a disc, and provided it to the Madison County Sheriff's Office. McPhaul filed a grievance alleging that, at 4:15 p.m. on August 20, 2018, he had informed an officer that he wished to speak to a supervisor to which the officer responded, "get away from my window before [I] throw you in isolation and my name is irrelevant[.]" Exhibits at 11. McPhaul also alleged that he was assaulted during the charged incident and suffered injuries. On September 12, 2018, McPhaul submitted a request to Brizendine for "all documents[,] recordings related to the incident – assault that occurred on 8-20-18[.]" *Id*. at 13.

[8] The State subsequently charged McPhaul with two counts of battery resulting in bodily injury to a public safety official, Level 5 felonies, and criminal mischief, a Class B misdemeanor. Notably, before trial, McPhaul filed a Notice of Meritorious Self Defense, a Motion for Specific Discovery requesting the full video footage from the date of the incident, and a Motion to Preserve Video Evidence. The day before trial, the trial court held a status hearing during which defense counsel alleged that the MCCC failed to preserve full video evidence from August 20. Following voir dire, the trial court held a hearing to address McPhaul's pending issues during which Brizendine testified that he

preserved video evidence from 4:57 p.m. to 5:00 p.m. on August 20, which was consistent with the incident reports he had received from the officers involved in the altercation. However, footage automatically deletes after roughly twenty-nine to thirty-two days unless otherwise downloaded or preserved. Thus, any other video footage from August 20, including the interaction that McPhaul alleged had occurred forty-five minutes prior to the charged incident did not exist. McPhaul verbally moved to dismiss and for a mistrial due to *Brady* violations, namely failure to preserve all video evidence from that day. The trial court took the matter under advisement but ultimately denied McPhaul's Motion to Dismiss and/or for Mistrial, reasoning:

> The Court again continues to see this as an issue that is – could be attack of the investigation, what was done, what wasn't done, which certainly can go to the strength and credibility of the State's case. . . . [A] lot of the arguments that [defense counsel] make[s] . . . are appropriate in the sense in how you wish to cross examine this case and how you intend on behalf of your client to possibly question the cred[ibility] of this case. The Court sees these being pertinent to those issues rather than this being viewed through a Brady examination.

Tr., Vol. I at 240. The matter proceeded to jury trial and at the conclusion thereof McPhaul tendered an instruction on self-defense, which the trial court refused to give. McPhaul was found guilty as charged and sentenced to an aggregate sentence of six years, with three years executed in the DOC and three years suspended. McPhaul now appeals. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Motion to Dismiss

[9] McPhaul argues that the "trial court abused its discretion in denying [his] motion to dismiss *and* motion for mistrial." Appellant's Brief at 8 (emphasis added). The State, on the other hand, argues that the trial court ruled on a motion for mistrial, not a motion to dismiss, because, when asked by the trial court, defense counsel clarified that it was a motion for a mistrial. We disagree with the State and conclude that McPhaul moved to dismiss his case.

[10] After voir dire and outside the presence of the jury, the trial court held a hearing to address McPhaul's pending issues before beginning the presentation of evidence. When asked whether McPhaul filed a formal motion to dismiss, defense counsel clarified, "No, actually Judge [it is] a Motion for Mistrial caused by *Brady* Issues." Tr., Vol. I at 156.[1] However, throughout the remainder of the hearing, McPhaul essentially argued for *dismissal* of his case due to the alleged failure to preserve evidence, evidence that no longer exists and that he claims would have demonstrated that he acted in self-defense. Ultimately, the trial court denied what it characterized as McPhaul's "Motion to Dismiss and/or for a Mistrial." *Id*. at 231. Although the trial court

---

[1] In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).

characterized it as such, a motion to dismiss for failure to preserve evidence and a motion for a mistrial are analyzed differently. On appeal, McPhaul argues the State's "failure to preserve the requested [video] evidence which was potentially useful to [him] was in bad faith and a clear violation of his due process rights that warranted a dismissal of this cause." Appellant's Br. at 11. Ultimately, the substance of McPhaul's argument and the authority he cites leads this court to believe the relief McPhaul sought was available only through a motion to dismiss. As such, we now evaluate whether the trial court erred in denying his motion.

[11] We review a trial court's denial of a motion to dismiss for an abuse of discretion. *Ceaser v. State*, 964 N.E.2d 911, 918 (Ind. Ct. App. 2012), *trans. denied*. We therefore reverse only where the trial court's decision is clearly against the logic and effects of the facts and circumstances before it. *Id*.

[12] Again, the crux of McPhaul's argument is that he was denied due process requiring dismissal of the case because MCCC acted in bad faith by failing to preserve all requested video evidence from August 20, including video of an alleged encounter forty-five minutes prior to the charged incident. In *Arizona v. Youngblood*, the United States Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. 51, 58 (1988). "Evidence is merely potentially useful if 'no more can be said than that it could have been subjected to tests, the results of which might

have exonerated the defendant.'" *State v. Durrett*, 923 N.E.2d 449, 453 (Ind. Ct. App. 2010) (quoting *Youngblood*, 488 U.S. at 57).

[13] McPhaul claims the prior encounter "ultimately led to him being assaulted by corrections officers" in the charged incident and this evidence would have been potentially useful to him at trial. Appellant's Br. at 10. However, we fail to see how evidence of an alleged encounter that occurred forty-five minutes prior to the charged incident provides any evidence that McPhaul was innocent or supports his theory that he acted in self-defense in the later altercation that was instigated when he repeatedly failed to comply with commands and physically resisted, causing injury to the officers. *See Durrett*, 923 N.E.2d at 453. Nonetheless, McPhaul attempts to demonstrate the State's[2] bad faith by characterizing the timing of the charges as suspicious because they were filed thirty-five days after the incident and just a few days after video evidence not saved to a disc would be automatically deleted. Additionally, McPhaul asserts that Brizendine decided to preserve only the three-minute portion of the footage *he* determined to be relevant and for the sole purpose of prosecuting McPhaul.

[14] Based on our review of the record, we are unpersuaded that MCCC or the State acted in bad faith with respect to the video evidence. At the hearing, Brizendine testified that he determined what portions of the footage to record and save. He explained, in doing so, "My responsibility and what my priority

---

[2] McPhaul argued to the trial court that the evidence was manipulated by a state actor, namely Brizendine, because he is paid by the State of Indiana. *See* Tr., Vol. I at 184, 201.

was to clip the footage consistent with the incident that occurred. What caused the Officers to enter the dormitory and what ensued there after [sic]." Tr., Vol. I at 172. Brizendine chose to record and save the footage from 4:57 to 5:00 p.m. because it was "consistent with the reports" he had received from the officers involved in the altercation. *Id.* at 182. He also explained that unless recorded, all footage captured on MCCC's surveillance is automatically deleted by the system after twenty-nine to thirty-two days, depending on the camera. Brizendine provided the incident reports and downloaded footage to the sheriff, who testified that he prepared a probable cause affidavit requesting criminal charges based on the information Brizendine provided. With respect to the timing, the sheriff testified at trial that because McPhaul was already detained, "there was nothing . . . so pressing that [the affidavit] needed to be completed right away" and he decided "to prepare the paperwork on a later date[.]" Tr., Vol. II at 193. Moreover, the sheriff was unaware that video footage automatically deletes until these proceedings began and had no reason to ask Brizendine to preserve additional evidence. With the evidence he had already received, "there was nothing else that [he] would be looking for." *Id.* at 197. The sheriff provided the affidavit and evidence to the prosecutor's office on September 7, 2018.

[15] We acknowledge that McPhaul referenced the 4:15 p.m. incident in his grievance filed on August 22 and subsequently filed several requests for footage to be preserved before the twenty-nine to thirty-two days had passed. However, McPhaul's requests specifically referenced "the incident - assault that occurred

on 8-20-18 by your hired help[.]" Exhibits at 12, 13.[3] Therefore, MCCC staff had no reason to believe they needed to preserve any footage before that incident that occurred. McPhaul has failed to establish any bad faith by MCCC or the State.

[16] As previously indicated, defense counsel argued his position to the trial court. However, following evidence and argument at the hearing on the motion, the trial court ultimately denied McPhaul's motion, explaining it disagreed that the alleged evidentiary issues require a *Brady* analysis. Instead, the trial court stated that it viewed the argument as an attack of the investigation, namely "what was done, what wasn't done, which certainly can go to the strength and credibility of the State's case." Tr., Vol. I at 240. This is a reasonable interpretation of McPhaul's motion and the applicable law. Therefore, we cannot conclude the trial court abused its discretion in denying McPhaul's motion to dismiss.

## II. Jury Instruction

[17] Next, McPhaul contends that the trial court erred when it refused to provide the jury with an instruction on self-defense. Specifically, McPhaul argues his proposed jury instruction was a correct statement of the law and the evidence presented at trial "clearly established that an instruction on self-defense was warranted." Appellant's Br. at 15. We disagree.

---

[3] We also note that McPhaul filed these requests on September 7 and 12, weeks after the incident occurred and after Brizendine already submitted the relevant information to the sheriff.

[18] The giving of jury instructions is a matter within the sound discretion of the trial court, and we review the trial court's refusal to give a tendered instruction for an abuse of that discretion. *Howard v. State*, 755 N.E.2d 242, 247 (Ind. Ct. App. 2001). An abuse of discretion occurs if the instructions, considered as a whole and in reference to each other, mislead the jury as to the applicable law. *Smith v. State*, 777 N.E.2d 32, 34 (Ind. Ct. App. 2002), *trans. denied*.

> Generally, we will reverse a trial court for failure to give a tendered instruction if: (1) the instruction is a correct statement of the law; (2) it is supported by the evidence; (3) it does not repeat material adequately covered by other instructions; and (4) the substantial rights of the tendering party would be prejudiced by failure to give it.

*Howard*, 755 N.E.2d at 247.

[19] "A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of *unlawful* force." Ind. Code § 35-41-3-2(c) (2013) (emphasis added). A person is also justified in using reasonable force against a public servant in some circumstances outlined by statute. Ind. Code § 35-41-3-2(i) (2013). A correctional police officer is considered a public servant. Ind. Code § 35-41-3-2(b) (2013); Ind. Code § 35-31.5-2-185(a)(1). However, a person is not justified in using force against a public servant if the person reasonably believes the public servant is acting lawfully or engaged in the lawful execution of the public servant's official duties. Ind. Code § 35-41-3-2(j)(4) (2013).

[20]     MCCC correctional officers "provide safety and security for all three . . . dorms[, and m]ake sure that everybody is safe[.]" Tr., Vol. II at 41. The State maintains that even if McPhaul provided a correct instruction, there was still "no evidence to support a conclusion that the correctional officers were not engaged in the lawful execution of their duties." Brief of Appellee at 21. The evidence demonstrates that McPhaul's behavior in throwing his tray against the control room window violated MCCC rules and officers were instructed to remove McPhaul from the dormitory floor. When Officer Robinson asked McPhaul to "cuff up," he ignored the instruction, walked past Officer Robinson, repeatedly ignored commands, and forcibly resisted while three officers attempted to restrain him. Tr., Vol. II at 47. There is no doubt that the correctional officers were engaged in the lawful execution of their duties, as instructed, and the record reveals no evidence of self-defense. As such, the trial court did not abuse its discretion by refusing to give the jury an instruction on self-defense.[4]

# Conclusion

[21]     For the reasons set forth above, we conclude the trial court did not err in denying McPhaul's motion to dismiss or in refusing to give a jury instruction on self-defense. Accordingly, the judgment of the trial court is affirmed.

---

[4] Because this issue is dispositive, we need not address whether the instruction McPhaul tendered was a correct statement of law.

[22]     Affirmed.

Mathias, J., and Pyle, J., concur.