USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ Nos. 96-1269, 96-1455, 96-1998, 96-1999 UNITED STATES OF AMERICA, Appellee, v. FRANK BRIMAGE and TRACY ROSS, Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Patti B. Saris, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Frances S. Cohen, with whom Michael D. Vhay, C. Dylan Sanders and ________________ _______________ ________________ Hill & Barlow PC were on brief, for appellant Tracy Ross. ________________ Peter B. Krupp, with whom Lurie & Krupp LLP was on brief, for _______________ __________________ appellant Frank Brimage. James F. Lang, Assistant United States Attorney, with whom Donald _____________ ______ K. Stern, United States Attorney, was on brief, for appellee. ________ ____________________ June 9, 1997 ____________________ LYNCH, Circuit Judge. A sting operation in the gun LYNCH, Circuit Judge. _____________ trade involving a government informant resulted in the arrest of Frank Brimage and Tracy Ross. Brimage was convicted of being a felon in possession of a firearm and ammunition; Ross, of being a felon in possession of ammunition, both in violation of 18 U.S.C. 922(g)(1). Brimage was sentenced to more than 11 years in prison; Ross to more than 8 years in prison.  The primary argument they make on appeal is that a federal agent acted in bad faith in monitoring but not recording their conversations during the sting (thus not preserving conversations said to be exculpatory) and that such bad faith requires dismissal of the charges. They also argue that there was error in not requiring the government to disclose prior investigative reports involving the government informant, and that certain other evidence was Brady material _____ which should have been disclosed. Ross argues in addition that he should have been granted a new trial based on newly discovered exculpatory evidence and that the district court erroneously concluded it did not have discretion to depart downward to make him eligible for a residential drug rehabilitation program. Both defendants are ably represented, but the record reveals no such errors and we affirm. I. -2- 2 This weapons transaction unfolded in a Boston neighborhood which had been plagued with drive-by shootings and murders. Freddy Pena, a supplier of both guns and drugs, decided to lessen his potential criminal liability -- on account of pending state cocaine charges and threatened federal firearms charges -- by accepting an offer extended by Special Agent Daniel Campbell of the Bureau of Alcohol, Tobacco, and Firearms (the "ATF") to become an informant. To compensate Pena for his initial efforts as an informant, the federal authorities intervened and arranged for a reduction in Pena's state charges, and they never brought the threatened federal firearms charge. Thereafter, he earned cash for his efforts, and was paid $600 for this particular sting. This sadly common urban tale unfolded in January of 1995. Frank Brimage then had a considerable criminal record, including commitments for rape, armed robbery, and assault with a deadly weapon. Tracy Ross had a relatively minor prior criminal record. He had been a high school basketball star who won a scholarship to college, but apparently flunked out. After this, he worked intermittently, and ultimately descended into heroin addiction. According to Ross, Brimage was his dealer. Brimage usually hung out next to a liquor store on Blue Hill Avenue in Boston. Pena approached him there on -3- 3 January 16, 1995 and asked him if he had any guns to sell. Brimage replied that he had a .32 caliber handgun and a .380 caliber handgun but was not going to sell them. Pena reported the conversation to his ATF contact, Campbell. Campbell told Pena to ask Brimage if he wanted to participate in an armed robbery of a drug dealer. Pena asked Brimage the next day, saying that he needed "two guys and two guns." Brimage responded "[t]hat's me." Ross then joined them. Pena and Brimage continued discussing the robbery; Ross indicated that he wanted to participate and asked how much money he would get out of it. None of these conversations were recorded or monitored by the ATF. Pena told the ATF agent that Brimage and Ross were willing to commit the robbery on January 19. On the appointed day, Agent Campbell met Pena and took him to the police station. Pena was strip-searched, wired with a transmitter, given a car, and told where to go and what to do. Pena was kept under surveillance by three mobile units, including one carrying Agent Campbell, who monitored the conversations from Pena's transmitter on an ATF portable radio. Two Boston Police Detectives were also in the unmarked vehicle with Campbell. Pena drove to the vicinity of the liquor store on Blue Hill Avenue to pick up Brimage and Ross. Brimage told Pena, in a conversation overheard by two officers, that they -4- 4 had to go to Greenville Street to get the guns. Before doing that, Brimage went into a store and emerged with a bag. Ross and Brimage got into the car and drove to Greenville Street. In an overheard conversation, Brimage said the bag contained tape. At Greenville Street, Brimage got out and went into a building. While he was gone, Ross again asked how the money would be divided. Pena told him to ask Brimage. When Brimage returned, Pena drove to a large parking lot in a shopping center where a Toys'R'Us was located, as the ATF agent had previously directed. En route, Pena talked about how the drug dealer would not resist so they would not have to shoot him. At the shopping center, Pena got out of the car and walked alone into the store, ostensibly to meet someone who had a key to the drug dealer's apartment building. On signal, the police teams surrounded the car. On the floor of the front passenger's side, where Brimage had been seated, the police found a .380 caliber semi-automatic pistol, loaded with six rounds of ammunition. On the floor of the rear passenger side, where Ross had been seated, the ATF agent found a .32 caliber revolver, loaded with five rounds, in a clear plastic bag. There were no fingerprints on the guns. On the rear seat was a white plastic bag with two rolls of duct tape. Brimage and Ross were arrested by -5- 5 the Boston Police. Throughout these events on January 19, Agent Campbell monitored but did not record Pena's conversations with the two defendants. II. Failure To Record Wire Transmissions ____________________________________ Defendants advance the theory that the ATF deliberately failed to record Pena's initial solicitation of their participation in the robbery and the circumstances of the sting, in a bad faith effort to avoid the creation or preservation of exculpatory evidence. From this they argue that: (1) the government is obligated not to act in bad faith in its decisions as to which conversations to record (and monitor); (2) that the appropriate remedy for a bad faith failure to record is dismissal of the charges; (3) that the district court was obligated to hold an evidentiary hearing; and (4) that the affidavits defendants submitted supported findings that the government acted in bad faith and that the "lost" evidence was exculpatory and irreplaceable. The government responds that it has no obligations whatsoever to record and thus "create" evidence. It says that the application of the bad faith test is limited to failure to preserve already existing evidence in the government's possession. The government argues that the doctrines announced in California v. Trombetta, 467 U.S. 479 __________ _________ (1984), and Arizona v. Youngblood, 488 U.S. 51 (1988), _______ __________ -6- 6 requiring the preservation of existing evidence, should be taken no further. In any event, the government says, the defendants' allegations do not rise to the level of bad faith under the test this court used in United States v. Femia, 9 _____________ _____ F.3d 990 (1st Cir. 1993), in the aftermath of Trombetta and _________ Youngblood. Femia, 9 F.3d at 993-95. __________ _____ The government is surely correct that the decision not to record a conversation is categorically different from the failure by police to maintain the breath samples of a drunk driving defendant, as was the case in Trombetta, or the _________ failure to preserve semen samples in a sexual assault case, as happened in Youngblood. Those cases raise issues of __________ destruction of evidence closer to those involved in Femia, _____ which concerned the destruction of recorded conversations. For the purposes of the Jencks Act, 18 U.S.C. 3500, we have already recognized such a distinction, holding that the Act, which requires the production of all statements by government witnesses relating to the substance of their testimony, does not require the government to record all aspects of interviews with witnesses, United States v. Lieberman, 608 ______________ _________ F.2d 889, 897 (1st Cir. 1979), or always to take notes, Campbell v. United States, 296 F.2d 527, 531-32 (1st Cir. ________ _____________ 1961). At the same time it is not particularly helpful to think of the issue as broadly as the government frames it: -7- 7 that there is absolutely no duty on the part of the government to "create" evidence. At issue here is the government's decision not to "create" independent verification evidence in the form of recordings and instead to rely on the memory of witnesses and their testimony about what was said, and we limit our inquiry accordingly. The breadth of the defendants' line of argument poses its own problems. It is, of course, easy for a defendant to raise a claim that an unrecorded conversation should have been recorded. Even if the recording of the conversation would have inculpated, not exonerated him, a defendant may get some benefit from the government's failure to record by raising the argument and flagging that issue for the jury. The government is quite correct to point to another problem with the defendants' argument. There is a need by law enforcement personnel for considerable flexibility in how they go about their investigations, and courts should not intrude into this area. That interest is somewhat lessened, but not eliminated here, by evidence that the ATF may have violated its own somewhat ambiguous regulations in deciding not to record the sting operation or the initial contact.1  ____________________ 1. The pertinent ATF policy required "all undercover contacts by . . . confidential informants" to be "supported by electronic surveillance monitoring/recording in order to enhance special agent/officer/confidential informant safety, as well as to collect evidence in the investigation." -8- 8 The government's interests may, however, be thought to cut another way in this matter. As this court recently noted in rejecting a Jencks Act challenge to the practice of government agents not to take notes or record interviews with government witnesses: By adopting a "what we don't create can't come back to haunt us" approach, prosecutors demean their primary mission: to see that justice is done. . . . By and large, the legitimate interests of law enforcement will be better served by using recording equipment and/or taking accurate notes than by playing hide-and- seek. United States v. Houlihan, 92 F.3d 1271, 1289 (1st Cir. _____________ ________ 1996). The issue is whether the fair trial rights of the defendants have somehow been violated by the failure to record. Some situations may raise concerns about whether the government is putting the due process rights of defendants at risk. Here, of the six persons who heard the conversations and could testify to them, four were on the government payroll (the three officers and the informant) and the remaining two, the defendants, would have had to waive their Fifth Amendment right to remain silent in order to testify to their versions of the conversations. However, that situation, absent a good deal more, is not in itself enough to raise due process concerns. -9- 9 Given the vastly different fact patterns in which this issue may arise, we see no reason to adopt the government's position that a decision by law enforcement officials not to record key conversations (to be relied on in the prosecution) between a defendant and a confidential informant may never be probed to determine if the decision was made in bad faith. Neither do we adopt the mirror rule that such a test is always appropriate, as defendants would have us do. Instead we turn to what we said once in a case raising a similar claim: Perhaps there may be a case where selective recording presents a reviewing court with constitutional concerns. We need not speculate on this score, however, for this is surely not such a case. United States v. Chaudhry, 850 F. 2d 851, 857 (1st Cir. 1988) _____________ ________ (rejecting due process claim of selective recording where defendant did not assert government acted in bad faith). Nothing about the circumstances of this case or in defendants' meager proffer comes close to raising concerns that Agent Campbell's decision not to record was made in bad faith. Brimage submitted an affidavit, in which he made no claim that the statements attributed to him were false but said only that "The statements that I made during my conversations with Freddy Pena, if taken in context, are much more innocuous than the statements . . . attributed to me out -10- 10 of context . . . ." Ross submitted an affidavit from counsel also suggesting that the statements by her client should be understood in context. Both counsel took advantage of the lack of context and argued to the jury the issue of the government's failure to record. Their proffer has quite a distance yet to go before it raises the spectre of bad faith. Defendants rely heavily on another argument: the allegedly implausible nature of Agent Campbell's articulated reasons for not recording. Defendants largely ignore Campbell's testimony that his squad usually monitored but did not record sting operations and that the primary reason for doing even that was to protect the confidential informant, not to create evidence. Agent Campbell testified before trial that he did not record the conversations here because this was a joint state-federal operation and he believed the recordings would be inadmissible in state court.2 At trial, Agent Campbell gave a somewhat different reason for not recording: "I didn't think I would have to rely on anything that was said in order to convict the both suspects [sic]." While the responses were characterized by the district court as "lame," they are not inconsistent and  ____________________ 2. The dispute between the parties as to whether such recordings are admissible in state court is largely irrelevant. One cannot say that the agent's understanding was plainly wrong, see Commonwealth v. Jarabek, 424 N.E.2d ___ ____________ _______ 491, 493 (Mass. 1981), that he should have known it was wrong, and thus that it was reasonable to think he had some other nefarious motive. -11- 11 do not show bad faith. In fact, Agent Campbell's assessment of the case may have been correct: the car was clean when Agent Campbell gave it to Pena to use in the sting, Campbell then monitored Pena's use of the car, and guns and ammunition were found on the floor of the car where each of the defendants had been sitting. The agent's testimony does not mandate an inference of bad faith. The claim that the district court was obligated, on this showing, to hold an evidentiary hearing on the issue of bad faith is without merit. Such decisions are within the discretion of the district court, United States v. Calderon, _____________ ________ 77 F.3d 6, 9 (1st Cir. 1996), and there was no abuse here. Prior Investigative Reports ___________________________ Brimage and Ross argue that the government's prior investigative reports should have been disclosed to them as they would have demonstrated the informant's modus operandi. This information might, they say,3 have shown that, in prior stings, Pena attributed to others the same incriminating comments he now attributes to them. This, in turn, might have shown that Pena was confused about who said what when. Defendants also argue that the reports might have shown that Pena had an opportunity to plant weapons and that he knew he could successfully attribute incriminating remarks to others  ____________________ 3. Defendants have reshaped their arguments somewhat on appeal. While there may be something to the government's waiver argument, the same result is reached on the merits. -12- 12 if he was not being recorded. By not having the reports, they say, they were deprived of their Sixth Amendment right to cross-examine Pena effectively. Although the trial judge preliminarily disagreed that the reports were discoverable exculpatory material within the terms of Brady v. Maryland, 373 U.S. 83 (1963), _____ ________ she did, at the defendants' request, review the reports in camera before trial. Judge Saris concluded that they contained no exculpatory information. The defendants at trial raised for the first time the argument that the reports were Jencks Act material. Judge Saris again reviewed the reports and again ruled they were not exculpatory and were not Jencks Act material. In fact, she found that the reports tended to buttress Pena's testimony. Our review of these determinations is for abuse of discretion. United States v. Femia, 57 F.3d 43, 45 (1st ______________ _____ Cir. 1995) (Jencks Act material); United States v. Perkins, ______________ _______ 926 F.2d 1271, 1276 (1st Cir. 1991) (Brady material). The _____ prosection vigorously disputes that these reports are Jencks Act material because the reports involved investigations other than the one in this case. We need not resolve that argument. This case does not provide the occasion to explore the parameters of the Jencks Act requirement that statements be produced "which relate[] to the subject matter as to which the witness has testified." 18 U.S.C. 3500(b). Like the -13- 13 district court, we have reviewed the reports submitted in camera. We readily hold that the conclusions drawn by the trial judge were not an abuse of discretion. The Motions for New Trial _________________________ 1. The Victoria Pena Evidence ______________________________ Defendants argue from the premise that the impeachment of Freddy Pena was key to the defense, despite the fact that the firearms and ammunition were found virtually at their feet. Even accepting the premise, the defense acknowledges that it knew at trial that Pena had been arrested in 1989 and charged in state court with a cocaine trafficking count, that the trafficking charge was reduced to a possession charge, and that Pena was sentenced to time served. What defendants did not know, they say, was that the charge was reduced because Pena's sister, Victoria Pena, had worked as an informant for the state police in a case involving another drug dealer, Jose Calderon. In January 1996, four months after the conviction, Brimage sought a new trial based on the government's failure to disclose this information. The district court held that the government had not suppressed the information within the meaning of United ______ States v. Osorio, 929 F.2d 753 (1st Cir. 1991), and that the ______ ______ evidence was not material in the sense of requiring a new trial. -14- 14 The denial of the motion for a new trial is reviewed for a manifest abuse of discretion. United States _____________ v. Tibolt, 72 F.3d 965, 972 (1st Cir. 1995). There was no ______ such abuse. We cannot say that this evidence "would so undermine the government's case as to give rise to a 'reasonable' probability of acquittal on retrial." Id. ___ Defendants say that the Victoria Pena evidence would have permitted them to pursue two different lines of examination: that Pena was an incorrigible drug and firearms recidivist and that Pena lied when he testified at trial that his sister Victoria had never dealt drugs out of their mother's home. A Brady violation occurs when "(1) the prosection _____ . . . suppress[es] or withhold[s] evidence, (2) which is favorable, and (3) material to the defense." United States _____________ v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991). We bypass the _______ Osorio issue of whether the government had this information ______ and suppressed it and go directly to the third prong of the Brady analysis. We agree with the district court that the _____ evidence is not material and our confidence in the verdict is not undermined by the fact that the defense lacked this information. Pena's character, if not unblemished before cross- examination, was thoroughly and ably sullied in cross- examination. Two pages of the district court's order denying -15- 15 the motion for a new trial were devoted to descriptions of the impeachment of Pena. His characteristic devotion to drugs and guns was explored. As to the "lie" about his sister, Pena testified only that she had never sold drugs out of her mother's home, and none of the new information is to the contrary: it only shows that she worked as an undercover informant for the state police. The premise of the entire argument -- that the case turned on the impeachment of Pena -- is itself flawed. There are the telltale guns and ammunition: the most likely explanation was that the defendants were in possession of them. 2. Ross' Motion for New Trial ______________________________ One month after the jury verdict, Ross filed a motion for a new trial based on newly discovered evidence: a statement by Michael Holmes, Brimage's cellmate after the arrest. The district court heard evidence and found that soon after Brimage was arrested: Brimage told Mr. Holmes that he (Brimage) had been "set-up"; that Ross had only been along for the ride as a "drug tester"; and that Ross' high bail was hard to understand, because Ross had had "nothing to do with it." In a later conversation, Brimage told Mr. Holmes that Ross was "in the back seat all high" and didn't know what was going on; and that he (Brimage) would tell the court that Ross had nothing to do with it. -16- 16 It is worth observing that Holmes is the son of Ross' fiancee. This claim is subject to the same review for manifest abuse of discretion as the other new trial motion and comes to the same end. The district court found, and we agree, that Ross failed to be diligent in attempting to secure Holmes' testimony before the trial ended. Ross himself knew of the alleged conversation between Brimage and Holmes within a month or two of the arrest and while Holmes was still in jail and thus reachable. In all events, it is unlikely that this new evidence would have resulted in an acquittal. Ross twice asked what his share of the take would be, and a gun and ammunition were found virtually under his feet. Ross' Sentencing Argument _________________________ Ross says that he is in need of drug treatment; that the guidelines authorize a downward departure, based on a likelihood of rehabilitation, to permit a defendant to enter a residential Bureau of Prisons drug treatment program that is only open to those within 36 months of release; that the district court misunderstood its authority to make such a downward departure when it sentenced him to 97 months; and that the case should be remanded for resentencing. Ross and the government go through the usual dispute as to how to characterize the issue, with the hopes -17- 17 of persuading us that the district court did or did not make an error of law. United States v. Saldana, 109 F.3d 100, ______________ _______ 102-03 (1st Cir. 1997). The question of whether the guidelines authorize a downward departure to permit a defendant to enter a residential drug treatment program is a thicket which we describe briefly but do not enter. In pragmatic terms, there is now only one residential drug treatment program, available at 34 sites, in the federal Bureau of Prisons system. There are many more inmates who need treatment than there are beds available in this residential program. The Bureau of Prisons has decided its program is best suited for those within 36 months of release. Here, Ross' guidelines range was 110 to 137 months imprisonment. He could not be immediately eligiblefortheprogramunlessthedistrictcourt departeddownward. The legal argument is put in these terms. Ross claims the district court had the authority to depart downward pursuant to 18 U.S.C. 3553(a)(2)(D), which directs the sentencing court to consider the need for "educational or vocational training, medical care, or other correctional treatment . . . ." The government counters that the guidelines categorically prohibit departures based on drug dependence. U.S.S.G. 5H1.4. The circuits are split on this issue. Some have concluded that, because drug rehabilitation presupposes drug -18- 18 dependence, the guidelines prohibit any departures to facilitate drug rehabilitation. United States v. Ziegler, 1 _____________ _______ F.3d 1044, 1049 (10th Cir. 1993); United States v. Martin, _____________ ______ 938 F.2d 162, 163-64 (9th Cir. 1991); United States v. Pharr, _____________ _____ 916 F.2d 129, 133 (3d Cir. 1990). Other circuits have concluded that, while the guidelines prohibit downward departures due to drug dependence per se, they do not prohibit departures based on a defendant's potential to be rehabilitated. United States v. Maier, 975 F.2d 944, 947-48 _____________ _____ (2d Cir. 1992); United States v. Williams, 948 F.2d 706, 710 _____________ ________ (11th Cir. 1991). We need not resolve the legal issue. Looking at the totality of the record, United ______ States v. Grandmaison, 77 F.3d 555, 561 (1st Cir. 1996), we ______ ___________ understand the district court to have decided that, in light of specific facts about Ross, it would not exercise any discretion it might have to authorize a downward departure. Ross had twice before failed to complete drug rehabilitation programs. As the court told Ross' counsel: I have less sanguine feelings than you do about the recidivism, particularly since here's a guy who panned out of a program one time, who is facing trial and then does it a second time. That worries me about his ability to comply with the rules of the program. Later the court ruled: I do not think that I'm going to downwardly depart on the ground of the likelihood of rehabilitation. I often say that people make their bed, they lie -19- 19 in it, and all I have on the record, despite the best of intentions, is that he went through two drug programs and they didn't work out. The trial court is in the best position to make such a discretionary judgment. That discretionary decision by the trial court is not subject to our review. To complete the picture, we note that the trial court did recommend to the Bureau of Prisons that Ross be admitted to an alternative 600-hour drug rehabilitation program while in prison. Affirmed. ________ -20- 20