**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Lonnie Albert SMITH Defendant.**

**No. 98 CR 214.**

United States District Court,
D. Colorado.

Aug. 28, 2000.

Gary Lozow, John Andrew Chanin, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, for Lonnie Albert Smith.

Alvin J. LaCabe, United States Attorney's Office, Rocky Mountain Drug Task Force, Denver, CO, for U.S.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

Defendant Lonnie Albert Smith stands accused of knowingly possessing cocaine with intent to distribute it, in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(B)(ii) (West 1981 & Supp.1999). The matter is before the court on "Defendant's Consolidated Pretrial Motions" (Docket # 16) and "Defendant's Motion to Suppress" (Docket # 27). The primary issue presented by the motions is whether the police officer whose affidavit was the basis for issuance of a warrant to search defendant's home made recklessly false statements in the affidavit by reciting his own interpretation of words used in conversations and omitting what was actually said. On several occasions, I held evidentiary hearings on Smith's motions. Investigator Gary Valko, a police officer for the City of Aurora (Colorado) and the affiant for the search warrant, testified, as did numerous other Aurora police officers who observed or heard the events which formed the basis for the search warrant. Arapahoe County Deputy District Attorney Emily Warren testified concerning her assistance in preparation of Investigator Valko's affidavit. Finally, the court heard from one Joy Shapiro (also known as "Joy Costello," her maiden name), who was acting as an informer helping the Aurora Police Department by attempting to purchase cocaine from defendant. The following recitation constitutes my findings of fact and conclusions of law regarding the motion to suppress.

## FACTS

### 1. The Search Warrant and Supporting Affidavit

Because the question whether the affidavit contains recklessly false statements initially requires close comparison between what Investigator Valko put in the affidavit and what actually occurred, I commence with a detailed recitation of the affidavit's contents. The affidavit begins by describing Investigator Valko's background as a police officer. This background includes his specific experience as a vice and narcotics officer. This experience, he asserts, has given him familiarity with the appearance, packaging, and concealing of drugs. Pertinent to this case, Investigator Valko recites that he is familiar with "slang terms frequently used to refer to these drugs and things closely related to their use and sale."

The affidavit next sets forth generally the reasons why investigators began to focus on Smith. "Over the past several years," it says, Aurora police officers had received information from five cross-corroborating confidential informers that Lonnie Smith was selling multiple kilograms of cocaine per month. His method of operation, according to the informers, required the purchaser to page Smith, who would then return the call and arrange a drug transaction.

After describing this general background, the affidavit launches into a narrative of events which occurred on May 6, 1998, and culminated in the request for a warrant to search Smith's house. "[A] previously reliable confidential source," who was later identified at the motions hearing as Joy Shapiro, agreed with Aurora police to undertake a controlled purchase of cocaine from Smith, under the supervision of Aurora police officers. Shapiro had allegedly known Smith for several years, during which time she had twice purchased one-eighth ounce quantities of cocaine from him. She claimed to have seen cocaine stored at various locations

within Smith's residence. She also described the furnishings in the residence and the vehicles parked in the garage, and those descriptions were later verified by Investigator Valko when he secured the residence before applying for a warrant to search it. Shapiro also claimed to have seen Smith with a kilogram of cocaine "as recently as approximately July 1997"—some ten months before she agreed to participate in the controlled purchase in May 1998.

Before they began the attempt to make a controlled purchase of cocaine from Smith, asserts the affidavit, police placed a concealed transmitting device on Shapiro's person to monitor and record her conversations with Smith. They also gave her $500 in marked money to buy the cocaine. She called Smith's pager, and he shortly thereafter returned her call.

The next four short paragraphs are the heart of the affidavit, and they are worth repeating verbatim. I have inserted bracketed numbers for convenient reference in my later discussion of the affidavit:

[1] *The informant [Shapiro] advised SMITH that he/she wanted to purchase $500.00 (five hundred) worth of cocaine.* SMITH made arrangements to meet the informant at the Amoco Station located at East Mississippi Avenue and South Chambers Road, City Aurora, Arapahoe County, Colorado that evening *to conduct the drug transaction.*

[2] At approximately 9:00 p.m. on May 6, 1998, the confidential source was escorted by Aurora Police Department Narcotics officers, to the aforementioned location *designated by SMITH to conduct the cocaine transaction.* SMITH was observed by officers arriving alone in a 1994 Toyota Land Cruiser, Colorado license plate # F1 B7963, registered to Lonnie SMITH at 15971 E. Tennessee Avenue.

[3] The informant met with SMITH in his vehicle. Officers overheard SMITH tell the informant, via the concealed transmitting device worn by the informant, *that he did not bring the cocaine*

*with him* and expressed concern that the confidential source was possibly an informant. SMITH told the informant that he wanted to take the informant to his residence at 15971 E. Tennessee Avenue *to make sure the informant was not wearing a transmitting device.*

[4] The informant and SMITH were followed by officers to SMITH's residence at 15971 E. Tennessee Avenue. Upon arriving, officers again overheard via the concealed transmitting device worn by the informant, SMITH ask the informant to see the $500.00 and state that the cocaine was inside his residence.

(Emphasis supplied.)

In order to protect the informer, the police intercepted Smith and the informer before they entered Smith's home. Smith allegedly allowed the police to enter his residence and to search his person and the Toyota Land Cruiser that he had been driving. While he was calm and unconcerned with those searches, he became "very nervous and agitated" by a request to search his residence. The residence was therefore secured, and Investigator Valko, assisted by Deputy District Attorney Emily Warren, prepared the affidavit and presented it to a state judge. At 2:04 o'clock a.m. on May 7, 1998, the state judge issued the warrant authorizing a search of Smith's home.

## 2. The Underlying Facts Disclosed by Testimony at Evidentiary Hearings

At the very least, the confidential informer and Smith had mutual friends and had socialized together (playing cards and ingesting cocaine) for several years. Although the search warrant affidavit says nothing about their relationship (aside from the dry recitation that she had purchased cocaine from him), the transcribed conversations between them encompass terms of endearment ("hon," "honey," "sweetie") and exhibit a coquettish quality, including evocative double entendres, suggestive of some degree of past and/or potential intimacy. Ms. Shapiro unequivo-

cally denied that there was any intimate relationship, but her denial is inconsistent with the conversations, and the demeanor and tone of her denial at the evidentiary hearings causes me to infer that she "doth protest too much."

I also found Joy Shapiro to be a wholly incredible witness on this and other issues. Ms. Shapiro appears to be one of those persons who has one foot in the murky netherworld of drugs and crime and the other foot in regional law enforcement offices, and who becomes so adept at role playing that she loses touch with reality. At the very least, commencing in 1997, Shapiro had been a paid informer for the Federal Bureau of Investigation, then the Aurora Police Department, and finally the United States Drug Enforcement Administration. She acknowledged her drug addiction but implied that she was drug-free in May 1998 by claiming that she was undergoing regular urinalysis at that time. The claim that she was undergoing urinalysis was demonstrated to be false, thus casting doubt on the implication that she was drug-free during this period. In any event, what is very clear is that, on May 3, 1998, Shapiro had stolen checks from an older couple who were family neighbors and thereafter negotiated the forged checks. Shapiro was under investigation by Denver police for this incident.

The doubt cast on Shapiro's veracity by her background was heightened by the quality of her testimony itself. It was consistently evasive and non-responsive and occasionally contradictory. There were even moments when the testimony entered the realm of fantasy, as when she insisted that she had been appointed to some positions of civic responsibility by Colorado Governor Roy Romer and Denver Mayor Wellington Webb. In light of the background recited in the previous paragraph, I find such testimony to be fanciful.

Although the search warrant affidavit recites that Shapiro had seen Smith in the possession of cocaine "as recently as approximately July 1997," it omits to relate a significant conversation about which Investigator Valko admitted knowledge. In July of 1997, FBI investigators recorded a phone conversation between the confidential informer and Smith. During this conversation, Smith and the confidential informer discussed primarily Smith's purchase of golf equipment from the shop where the confidential informer worked. Although Shapiro attempted to portray this as a coded conversation about purchasing cocaine from Smith, the transcript (PX 7) suggests that her interpretation of the conversation is far-fetched and fanciful. There is nothing about this transcript which supports a reasonable inference that it is about a drug transaction. In any event, it is clear that, between the time of that phone call and May 6, 1998, neither the confidential informer nor any law enforcement official had any contact with Smith.

Throughout the day on May 6, 1998, Aurora police officers recorded conversations between Smith and the confidential informer as Shapiro tried to set up a controlled purchase of drugs from Smith. Most notably, in a call initiated at 4:35 o'clock p.m. and successfully recorded by the police, Smith and the confidential informer ("CI") had the following exchange:

Smith: So, why did you want to see me?

CI: Nah, just wanna see you for other things.

Smith: Okay, what, I can't talk right now. Can I reach you later on?

CI: Um, okay, this is my cell number
. . .

Smith: What about your house?

CI: Um, for my house? Um, it's 642. . . .

Smith: No, no, what is it, the amount?

CI: . . . amount? Uh, wanna look at doing five hundred.

Smith: That's all?

CI: Yeah.

Smith: Okay, five hundred, I know.

CI: I don't know. It's uh, it, that, that's just a figure I thought would be good.

Smith: Okay, I can do it.

(PX 9.) This conversation became the basis for the statement in the affidavit, "The informer advised SMITH that he/she wanted to purchase $500.00 (five hundred) worth of cocaine."

Thereafter, Smith told the confidential informer to come alone and meet him at an Amoco gas station at the intersection of Mississippi Avenue and Chambers Road. The confidential informer, who had been fitted with a hidden transmitting device, arrived at the Amoco station at approximately nine o'clock p.m. in a Yellow Cab driven by an undercover Aurora police officer. Approximately ten Aurora police officers at or near the Amoco station were maintaining surveillance of the scene. Officer Debra Cramer was assigned the task of taking written notes on the conversation between Smith and the confidential informer. Further, all of the surveilling officers' vehicles were equipped to monitor the conversation between the confidential informer and Smith through in-car radio scanners.

Officer Scott Torpen, who was in the same car as Officer Cramer, had the additional responsibility of recording the transmitted conversation through a receiver/recorder called a "Kel kit." According to Officer Torpen, who has operated Kel kits approximately 100 times, the Kel kit appeared to be recording properly during the planned controlled purchase. Officer Torpen was unaware that the recording was, in fact, inaudible until several days after he had attempted to make the recording. Thus, evidence concerning the conversation between Smith and the confidential informer during the planned controlled purchase is limited to Officer Cramer's notes and surveilling officers' testimony regarding their memory of what they heard broadcast on the scanner.

After Smith and the confidential informer met at the Amoco station, the confidential informer (at Smith's direction) told the cab to leave and then got into Smith's vehicle. According to Officer Cramer's notes and the testimony of other officers, Smith asked the confidential informer, while they were still at the Amoco station, if she had been in trouble for "snitching." The confidential informer denied being a "snitch," and, according to Cramer's notations, the following exchange occurred shortly thereafter:

CI: My 'g' string is on me

Smith: Can I see it

CI: You're so naughty

Smith: We'll go to my house

CI: Okay.

(PX 11.) Other surveilling officers including Officer Dale Quigley and Officer Torpen confirmed that Smith asked the confidential informer about her g-string, although Officer James Gentry (who was in a police car with Investigator Valko, monitoring the conversation) and the confidential informer both testified that Smith asked to see her "thong."

Shortly thereafter, the confidential informer and Smith left in Smith's car and drove to Smith's house at 15971 E. Tennessee Avenue in Aurora, Colorado. The surveilling officers trailed Smith's vehicle and discussed with each other—through radio transmissions between their patrol cars—their concern for the safety of the confidential informer. It was agreed that they would need to contact Smith before the confidential informer was compelled to enter his house. Upon arrival at his residence, Smith backed his car into the driveway.

There is some dispute as to what transpired between Smith and the confidential informer between the time when they arrived at Smith's residence and the moment when the officers first contacted Smith. The confidential informer and Gentry both testified that Smith asked the confidential informer to show him her money for the drug purchase either before they got out of the car or as they made their way inside the house. Officer Quigley testified that Officer Warren Miller, as well as Officers

Gentry, M.K. Sweeney, and L.D. Richmond, all told him that they had heard Smith indicate that he would have to go inside to get the drugs for the confidential informer. Aside from Officer Gentry and the confidential informer, none of the officers claims to have heard the word "dope" used either during this particular exchange or at any point during the evening, and none of the officers claims to have heard the term "drug" or "cocaine" at all.

Soon after Smith and the confidential informer arrived at Smith's residence, the assembled officers initiated a so-called "high-risk felony contact" with Smith. That is, before Smith and the confidential informer reached Smith's door, several officers, some on foot and some in unmarked vehicles with their headlights on, approached Smith on his front lawn. At least Officer Richmond wore a face mask as he approached Smith. According to Investigator Valko, the officers were concerned about their own safety because they knew from the confidential informer that Smith had been known to carry weapons. For that reason, officers pointed their weapons at Smith, ordered him and the confidential informer to the ground, and then handcuffed and "patted-down" each of them. Officers then removed the confidential informer from the area. Thereafter, Smith, who appeared very nervous, gave consent to the officers to search his vehicle and his person. No drugs were found in either location. Smith also gave consent to the officers to enter his home and, once the parties were inside, gave the officers permission to search a single duffle bag by the door and to sweep his house to see if anyone else was present. Smith refused to consent to any further search of his house, however.

Upon leaving Smith's house, Investigator Valko returned to the Aurora police department to write an affidavit to support his application for a search warrant for Smith's residence. As Investigator Valko drafted the affidavit, his work was reviewed by Deputy District Attorney Warren. She testified that she has a practice of suggesting to officers working on such documents that they use more familiar terms in lieu of street slang. It appears that she followed that practice in this case.

On May 9, 1998, having reviewed the tape of the attempted controlled purchase, Investigator Valko discovered that the recording was so muffled that it was inaudible. On May 11, 1998, Investigator Valko gave Officer Michael Simmons, the tape technician, the original tape. Although Officer Simmons could not account precisely for the error causing the faulty recording, he found no evidence that anyone had intentionally tampered with the tape. Ultimately, however, Officer Simmons was unable to recover the voices. On May 18, 1998, Investigator Valko and Officer Gentry took a statement from the confidential informer. Although they spoke to her over the telephone and recorded her statement, the tape was transcribed into a written statement including only the words of the confidential informer. The tape of the telephone interview was then destroyed.

Beginning July 1, 1998, officers who had been conducting surveillance of the May 6, 1998, attempted controlled purchase wrote reports on the incident. They did so in response to the requests of Investigator Valko, who sought the reports for discovery purposes after he had met with the United States Attorney's office concerning the Smith case. Shortly thereafter, defendant filed his first motions in the case.

Smith's first pretrial motions argued, *inter alia*, that (1) the indictment against him should be dismissed based on the Government's failure to preserve evidence of the conversation between Smith and the confidential informer on May 6, 1998, and (2) the fruits of the search warrant should be suppressed because the issuance of the warrant was based on intentionally misleading information. (Def.'s Consolidated Pretrial Mots. [Doc. # 16].) He thereafter filed a separate motion to suppress, arguing that all references in the search warrant affidavit regarding the furnishings inside Smith's home should be stricken and the fruits of the search of Smith's home

should be suppressed because Smith did not give voluntary consent to officers to enter his home. (Def.'s Mot. to Suppress [Doc. # 27].) Finally, on March 22, 1999, Smith filed a supplemental brief in which he reiterated the above-described contentions and further argued that the case against him should be dismissed because the Government destroyed a recording of a statement made by the confidential informer after the attempted controlled purchase. (Def.'s Supplemental Br. in Supp. of Pretrial Mots. [filed Mar. 22, 1999].) The Government responds that (1) no evidence was intentionally destroyed in this case, except according to Aurora police department policy, (2) Investigator Valko's affidavit included only honest representations of the facts, and (3) Smith freely and voluntarily consented to let officers enter his house. (Government's Supplemental Br. in Opp'n to Def.'s Pretrial Mots. and Resp. to Def.'s Supplemental Br. in Supp. Thereof [filed Apr. 7, 1999] [hereinafter "Gov't's Supplemental Br."].)

## ANALYSIS

### 1. Destruction of Evidence

■ If the Government fails to disclose material, exculpatory evidence to a defendant, the good or bad faith behind the Government's conduct is irrelevant and the case may be dismissed for failure to provide due process. *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). The Supreme Court has held, however, that "the Due Process Clause requires a different result when [a court] deal[s] with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* Under those circumstances, where "the exculpatory value of the evidence is indeterminate and all that can be said is that the evidence was 'potentially useful' for the defense, a defendant must show that the [G]overnment acted in bad faith in destroying the evidence." *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir.1994) (citing *Youngblood*, 488

U.S. at 58, 109 S.Ct. at 337). Thus, in order to establish a due process violation from the Government's failure to preserve evidence which is not necessarily exculpatory, a defendant must show that: "(1) Government officials acted in bad faith; (2) the evidence is material in showing the defendant's innocence; and (3) there is no alternate means of demonstrating the defendant's innocence." *United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997) (citing *Youngblood*, 488 U.S. at 56, 109 S.Ct. at 336; *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 [1984] ).

■ In this case, it is plain to me that the Government has not committed a due process violation in its failure to produce audible tapes of (1) Smith's May 6, 1998, encounter with the confidential informer, and (2) the subsequent statement of the confidential informer. Even as Smith argues correctly that the standard practice of the Aurora police department is to record controlled purchases, he does not offer evidence to demonstrate that these particular recordings were absolutely exculpatory. Indeed, the evidence points to the contrary conclusion. The question remains, however, whether the Government acted in bad faith with regard to the destruction of either of the tapes.

The mere fact that the Government has destroyed or otherwise damaged a tape of a recorded conversation does not, in itself, suggest the bad faith of the Government. *See Thompson*, 130 F.3d at 686 (finding no bad faith or malice despite prosecution's destruction of flawed tape recording of discussion between the defendant and an informer). Here, there is no evidence that the Aurora police exercised bad faith in handling the Kel kit tape recording of the controlled purchase. Officer Torpen testified that he had no awareness of any malfunction in making the original recording with the Kel kit. Simmons attempted to restore some audio quality to the tape, but was nonetheless unable to recover any voices. Investigator Valko testified that

he did turn over a copy of the Kel kit tape recording, such as it was, to Smith.

According to Smith, the tape he received of his conversation with the confidential informer was inaudible, a fact substantiated by the testimony of all the Government witnesses from the Aurora police department who heard the original Kel kit tape. Smith's countervailing assertion that the recording was, at one point, actually audible, but somehow later concealed or altered by the Aurora police is also not persuasive. I draw this conclusion based on the extensive testimony concerning the tape's obscured voices and the fact that only the confidential informer, whose testimony I found to be wholly incredible, suggested that her tone of voice could be discerned on the tape.

With regard to the tape of the confidential informer's statement taken after the controlled purchase operation, I also find no evidence that the Government acted in bad faith. Investigator Valko presented undisputed testimony that the "normal practice" of the Aurora police department when tapes are to be transcribed into "report form" is that "the secretaries type it, and they erase the tape and return it. . . . unless we request otherwise—and I didn't in that case." (Tr. Vol. I at 49.) These facts suggest to me that the officers acted in good faith in their treatment of the recordings in this case.

Even if the Government had acted in bad faith in its failure to produce audible cassette recordings of either the May 6, 1998, attempted controlled purchase or the confidential informer's later statement, however, I would still find that Smith failed to demonstrate that any due process violation occurred because he has not shown that these recordings were the only means to prove his innocence. It is undisputed that, in addition to Smith and the confidential informer, approximately ten Aurora police officers heard the May 6, 1998, transaction between Smith and the confidential informer as it transpired. Similarly, Investigator Valko and Officer Gentry took the confidential informer's

statement, and an Aurora police department secretary transcribed the original tape of the confidential informer's statement. Thus, there were multiple witnesses who could have testified to the contents of each of the conversations which were allegedly recorded. Such circumstances provided sufficient grounds to deny the defendant's due process claim in *United States v. Brimage*, 115 F.3d 73 (1st Cir.1997). In *Brimage*, when Government agents intentionally decided not to record conversations integral to the prosecution's case, the court found that the defendant's due process rights were nonetheless not at risk because six persons who heard the conversations could testify to them. According to the First Circuit, even the fact that of those six persons, three were officers, one was a paid informer, and two were other defendants who would have had to waive their fifth-amendment right to remain silent in order to testify, was not "in itself enough to raise due process concerns." *Id.* at 77. In this case, too, the witnesses to the tape recordings would have been all either on the Government payroll or subject to the fifth-amendment right not to testify. Because I find no evidence of the Government's bad faith in its alleged destruction of evidence and the tapes were not of such a nature that the defendant would be unable to obtain comparable evidence by reasonably available means, I reject Smith's motion to dismiss on due process grounds.

### 2. Search Warrant Affidavit

While fourth-amendment doctrine accords great deference to a magistrate's finding of probable cause and issuance of a search warrant, such deference "does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984) (citation omitted). Indeed, "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly

false statement, were to stand beyond impeachment." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). In assessing a challenge to the validity of an affidavit on the basis of the veracity of its statements, the court makes the following inquiry:

> In the event that ... the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided ... to the same extent as if probable cause [were] lacking on the face of the affidavit.

*Id.* at 155–56, 98 S.Ct. at 2676.

I find no fault with an agent using his skills and experience to interpret the meaning of ostensibly coded language to refer to the trade and use of narcotics. Indeed, other courts have found "[t]he use of cryptic or coded expressions supportive of probable cause finding." *United States v. Shakur*, 560 F.Supp. 318, 334 (S.D.N.Y. 1983), *aff'd sub. nom United States v. Ferguson*, 758 F.2d 843 (2nd Cir.1985) (citing *United States v. Sisca*, 503 F.2d 1337, 1343 [2nd Cir.1974]). In cases where probable cause has been found based on interpretations of defendants' or suspects' slang use, however, the investigators have either appended the transcripts of recorded conversations to their affidavits or explicitly indicated ways in which particular language, *which was included in the investigators' affidavits*, was "translated" or "interpreted" by the affiant officer. For instance, in *United States v. Lilla*, 534 F.Supp. 1247 (N.D.N.Y.1982), the court found probable cause sufficient to issue an eavesdropping warrant where:

> Relying upon his experience as a narcotics investigator, [the affiant] stated in affidavit [sic] that, in drug vernacular, "pharmaceutical" means cocaine. Additionally, the investigator averred, based upon conversations seized over the telephone, ... "car" and "snow tires" pertained to cocaine; "convertible" and "soft top" signified fine cocaine powder;

"hard top" denoted rock or crystalized forms of cocaine; and "additives" referred to agents used to prepare or cut cocaine.

*Id.* at 1256. Similarly, in *United States v. Feola*, 651 F.Supp. 1068 (S.D.N.Y.1987), the court gave credence to a detective's extensive affidavits, which asserted that terminology including "roast beef sandwiches," "golf courses," "property," "pottery," and "six broads" served as coded references to narcotics. *Id.* at 1110–11. While noting that several of the transcribed (and appended) intercepted conversations could also be consistent with an "innocent" interpretation, the *Feola* court found that "almost any obscure noun can be used as a euphemism for drugs" and the affiant was not required to give a term-by-term explanation of why he believed that a term used had a particular coded meaning. *Id.* at 1110.

By contrast, the critical language in the affidavit here (quoted verbatim beginning at page 3) states unequivocally, "The informant advised SMITH that he/she wanted to purchase $500.00 (five hundred) worth of cocaine." This declaration suggested to the issuing judge that the informer and Smith used these words, synonyms, or equivalent slang and that there had been some meeting of the minds. That is simply false. The words actually exchanged were much less definitive and more ambiguous. Even if one assumes that Smith had dealt cocaine in the distant past, it is not clear that "doing five hundred" conveys to Smith the notion that the informer was offering to purchase something from Smith for $500, and the conversation is entirely bereft of anything which suggests that Smith was to convey any drugs to the informer in return. The omission is significant because the transcripts themselves contain material from which one could reasonably draw an inference as valid as the one which Investigator Valko drew: the recorded message on Smith's answering machine alluded to the fact the Smith was trying to sell a vehicle, and Smith may

have thought the informer was offering to purchase the vehicle. The effect of Investigator Valko's misleadingly unequivocal recitation in the affidavit and his failure to convey any sense of the actual ambiguity of the conversation is that he assumed the part of Humpty Dumpty:

> "When *I* use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean— neither more nor less."

> "The question is," said Alice, "whether you *can* make words mean so many different things."

> "The question is," said Humpty Dumpty, "which is to be master—that's all."

Charles L. Dodgson, *Through the Looking Glass* 205 (1934). Here, it is the issuing judge, not the affiant, who must "be master" and decide the meaning of what was said.

The succeeding parts of the affidavit repeatedly and misleadingly carry forward the illusion of certainty that a drug transaction was being discussed. The very next sentence of paragraph numbered [1] declares that Smith and the informer made arrangements to meet at a specified location, "to conduct the drug transaction," thus suggesting that there had been some further discussion of drugs. This was false. Examination of the transcript demonstrates that there was no discussion of drugs in connection with the meeting place. (PX 9.) Paragraph numbered [2] mentions that this location was "designated by SMITH to conduct the cocaine transaction," again implying that there had been a discussion of drugs in connection with the meeting place. This was likewise false. Paragraph numbered [3] definitively recites that officers heard Smith "tell the informer ... that he did not bring the cocaine with him." This was materially misleading, because the consistent testimony of all officers was that Smith never used any words like "cocaine," "dope," or any equivalent slang or coded term. His actual words (that he didn't have "anything" with him or that he didn't bring "it" with him) are far less conclusive.

The recitation in paragraph numbered [3] that Smith wanted to take the informer to his residence "to make sure the informant was not wearing a transmitting device" both suggests a guilty state of mind and is misleadingly definite. In fact, according to everyone who testified, the informer and Smith had engaged in repartee in which Smith had asked to see the informer's "g" string, thong, or underwear, and the informer had refused.. The tone of the actual conversation is teasing and insinuating. It is at least as suggestive of an amorous relationship between the interlocutors as it is of Smith's suspicion that the informer was wearing a transmitting device. The misleading clarity in the affidavit, however, deprived the issuing judge of the opportunity to evaluate the ambiguity accurately.

Paragraph numbered [4] purports to relate a conversation between defendant and the informer after they arrived at defendant's house. It recites that the officers overheard Smith ask to see the $500 and state that "the cocaine was inside his residence," thus continuing and reiterating that Smith understood the informer to be offering $500 for a quantity of cocaine. The various officers' testimony about what actually happened is hopelessly confused and inconsistent. Of the numerous persons who overheard the conversation, only the confidential informer—whose inconsistent, evasive, and, at times, incoherent testimony I felt to be utterly incredible—and Officer Gentry—who ten days later heard and recorded the confidential informer's *ex post facto* statement and only two months thereafter prepared his own memorialized version of events—testified that, once his car was parked in his driveway, Smith asked the confidential informer to "see the money." Likewise, although "Investigator Valko also believed that cocaine was the drug at issue," it is undisputed that none of the officers ever heard Smith or the confidential informer use the word "cocaine" during this part of the conversation or at any other time. (Gov't's Supplemental Br. at 16.) I note further that, accord-

ing to Investigator Valko's account at the evidentiary hearing, Officer Gentry had not, in contemporaneously imparting to Investigator Valko what Smith was saying, repeated the words "cocaine," "drugs," or "dope," (Tr. Vol. II at 101)—although Investigator Valko later seems to contradict that account. (Tr. Vol. II at 127.) Gentry and the confidential informer, however, testified that they both heard Smith say that the "dope" was in his house.

In trying to sort through this contradictory testimony, I first find that Smith never used words such as "cocaine," "drugs," or "dope" at any time. Officer Cramer, whose job it was to take notes on the conversation, did not hear anything of the sort. Officer Torpen, who was directly responsible for monitoring the "Kel kit," did not hear the words. Neither did any other officer, except for Gentry. I am convinced that Gentry's recollection is simply erroneous, perhaps because he was unconsciously influenced by what the informer told him ten days later when he recorded her statement. Gentry's own attempt to memorialize the event did not occur until nearly about two months later.

More important, I find, Gentry never reported to Investigator Valko on May 6, 1998, that Smith had used any phrase such as "cocaine," "drugs," "dope," or equivalent words. Investigator Valko so acknowledged when the specific question was put to him at the evidentiary hearing. Thus, paragraph numbered [4] of the search warrant affidavit was false in relating that Smith had told the informer that the cocaine was inside his residence.

The Government can draw no comfort or support from the fact that Deputy District Attorney Warren actively participated in the drafting of the affidavit in question. Warren's testimony was surprising and alarming, for she seemed largely oblivious to the proposition that the function of an affidavit for a search warrant is to communicate to a neutral judge a fair, accurate account of what happened, so that the judge may decide whether the true facts demonstrate probable cause. For Warren,

rather, the affidavit was regarded as a piece of forensic writing, designed to persuade the judge of a conclusion which she and the affiant had arrogated to themselves. This misbegotten approach does not change the nature of what was happening here: the officer and the deputy district attorney, fully aware of what was actually said on May 6, 1998, decided, jointly and deliberately, to interpret events in a preconceived way which suited their purposes and to place in the affidavit misleading language supporting their preconceived interpretation. This was clearly reckless.

In short, this appears to be a case where the officers first reached a conclusion about what was going to happen on May 6, 1998—and what they wanted to happen— and thereafter interpreted every event and word as confirming their conclusion. Although Investigator Valko's interpretation of the events and language used may have been one possible interpretation, it was not the only one. It is the job of the magistrate, not the affiant, to determine whether such an interpretation was the only reasonable one, or whether, as Smith argues, the conversation was consistent with a romantic tryst between Smith and the confidential informer. Thus, where the intercepted language is incorporated into or otherwise attached to the affidavit presented to the magistrate, the magistrate may then determine whether the Government agent "reasonably interpreted" the taped conversations. *United States v. Fury,* 554 F.2d 522, 530 (2nd Cir.1977). Without the primary source, however, or without some indication that the officers have "interpreted" the language used, the magistrate is reduced to the role of rubber stamp for the Government's interpretations rendered as fact. "Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon,* 468 U.S. at 923, 104

S.Ct. at 3421 (citing *Franks,* 438 U.S. 154, 98 S.Ct. 2674).

■ I decline to nullify the magistrate's function in issuing warrants and, therefore, must consider the probable cause finding based on Investigator Valko's affidavit in the absence of the misleadingly precise references, including:

• "The informant advised SMITH that he/she wanted to purchase $500.00 (five hundred) worth of cocaine" [1];

• Smith arranged to meet at a specified location "to conduct the drug transaction" [1];

• The specified location was "designated by Smith to conduct the cocaine transaction" [2];

• "Officers overheard SMITH tell the informant, via the concealed transmitting device worn by the informant, that he did not bring the cocaine with him" [3];

• "SMITH told the informant that he wanted to . . . make sure the informant was not wearing a transmitting device" [3];

• "[O]fficers again overheard via the concealed transmitting device worn by the informant, SMITH ask the informant to see the $500.00 and state that the cocaine was inside his residence" [4].

(Gov't Ex. 1 [Search Warrant & Aff.].) Without these references, the affidavit is essentially limited to information which the confidential informer and other sources provided to the Government long before the events of May 6, 1998, occurred. According to Investigator Valko's affidavit, the most recent sighting of Smith with cocaine occurred ten months prior to the issuance of the warrant. Particularly given that the warrant was sought for purposes of searching Smith's home, it is clear that the officers, who had already had an opportunity to search Smith and his vehicle on May 6, 1998, were obliged to demonstrate the likelihood of finding drugs *in the house.* As Deputy District Attorney Warren stated:

in the earlier portion of the affidavit, there is information concerning the fact that the [confidential informer] in this case had previously purchased cocaine from [ ] Smith. And so we would have probable cause to believe that that had occurred in the past, and we would have probable cause to believe that some kind of drug transaction was going on in a date in question. My concern would have been making sure that it was clear that we had probable cause to believe what specific type of drug transaction was occurring on the date in question. So I would have—I would have suggested that it be clarified.

. . . .

And I would have suggested, so why don't you say that's what we're talking about. Why don't we put the word "cocaine" in here so it makes it obvious to a court or to a judge that we are talking about a cocaine transaction here and a cocaine transaction in the past.

(Tr. Vol. IV at 290–91.) Whether or not, as Smith contends, Investigator Valko's words were inappropriately reshaped by Deputy District Attorney Warren, who "review[ed]" and suggested "modifications" to the affidavit, for this purpose, it is plain that the affidavit's words suggested a far greater level of specificity and clarity than the actual words which were exchanged. (*Id.* at 279, 281.) The above-cited passages from the affidavit suggest Investigator Valko's intentional misrepresentation of or reckless disregard for the truth, and so, must be excised from the face of the affidavit. Without these redacted lines, however, the affidavit contained stale information concerning cocaine possession activities ten months previously, together with Smith's suspicion that Shapiro was a police informer and a good deal of suggestive, disjointed conversation about some sort of transaction in which Shapiro was paying Smith a sum of money. Without the excised information, the magistrate could not have found probable cause to search Smith's home and therefore could not have issued the search warrant. Accordingly, Smith's motion to sup-

press is granted insofar as it refers to the issuance of the search warrant.

### 3. Search Without Consent

Smith further contends that the voluntariness of any consent that he might have given for officers to enter his home is vitiated by the officers' coercive show of force. On the basis of this allegedly illegal intrusion, Smith asks the court to strike from the affidavit any information that the officers gleaned from their entry into his home. Specifically, Smith argues that Investigator Valko was able to build the confidential informer's credibility by affirming her information that the interior of Smith's residence was furnished with leather and glass furniture and that he had a black roadster and a Harley Davidson motorcycle in the garage. Because I have already decided that the warrant was invalid on the basis of the affiant's misleading statements, however, such an inquiry is unnecessary. Accordingly, Smith's motion to strike and suppress on the basis of nonconsensual entry is denied as moot.

### 4. Conclusion

Based on the foregoing findings and conclusions, it is therefore

ORDERED as follows:

1. Defendant's consolidated pretrial motions are GRANTED in part and DENIED in part.

2. Defendant's consolidated pretrial motions are GRANTED to the extent that they seek to suppress evidence obtained in a search warrant not based on probable cause.

3. Defendant's consolidated pretrial motions are DENIED in all other respects.

4. Defendant's motion to suppress for lack of probable cause is GRANTED.

3. Defendant's motion to strike and suppress for lack of consent is DENIED as moot.

4. The Government's motion for pretrial hearing and re-setting (# 20) is DENIED as moot.

5. The court will hold a status conference in this case on September 21, 2000 at 9:15 o'clock a.m.