IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 1, 2015

**STATE OF TENNESSEE v. WALTER SHEGOG**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01793     James C. Beasley, Judge**

---

**No. W2014-02440-CCA-R3-CD  -  Filed October 13, 2015**

---

Aggrieved of his Shelby County Criminal Court jury conviction of theft of property valued at $1,000 or more but less than $10,000, the defendant, Walter Shegog, appeals, claiming that the trial court was without jurisdiction to impose his conviction because the offense occurred on federal property, that the trial court erred by refusing to dismiss the indictment based upon the State's destruction of certain evidence, and that the trial court erred by permitting the State to use all of the defendant's prior convictions as impeachment evidence. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROGER A. PAGE and TIMOTHY L. EASTER, JJ., joined.

Terrell Tooten, Memphis, Tennessee, for the appellant, Walter Shegog.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Shelby County grand jury charged the defendant with one count of theft of property valued at $10,000 or more but less than $60,000.

The State's proof at the defendant's August 2014 jury trial established that the victim, Justine Lane, placed an advertisement in the newspaper offering her 2006 Mustang convertible for sale. On Monday, September 17, 2012, the victim's husband awoke not feeling well, so the Lanes decided to go to the Veteran's Administration Hospital ("V.A. Hospital") in Memphis to see if Mr. Lane, a disabled veteran, could be

seen by a doctor. Just before they left, the victim answered a telephone call from a man who identified himself as Corey Maclin inquiring about the Mustang. The victim noticed that the caller identification on her telephone listed the location of the call as the V.A. Hospital and asked the caller if he was calling from that location. The caller told the victim that he worked at the V.A. Hospital. The victim and the caller made plans to meet at the V.A. Hospital so that the caller could look at the car.

Shortly after the Lanes arrived at the V.A. Hospital, they met the person identifying himself as Corey Maclin but whom both later identified as the defendant. Mr. Lane went into the clinic, and the victim took the defendant to the parking lot to show him the car. As they walked to the car, the defendant inquired whether the vehicle was equipped with OnStar or a theft protection system. The defendant asked to see the vehicle's engine and interior and asked the victim to start the car so that he could see how it ran. The defendant then got into the driver's seat and told the victim that he was "'gonna just drive it right around here.'" Mr. Lane came out of the clinic just as the defendant drove the car out of the parking lot.

When the defendant did not return within a few minutes, Mr. Lane suggested that the victim go inside and ask if a person named Corey Maclin worked there. When they learned that no one by that name worked at the V.A. Hospital, the Lanes went to speak with the V.A. Hospital police. Before they got to the V.A. Hospital police office, the defendant telephoned the victim and said, "'I'm sorry I'm taking so long. I went to the bank to . . . get the funds and get the money – get a check and everything.'" The victim told the defendant to bring the car back because her husband had already called the police. The defendant told her that he would be back in 10 minutes, and she told him that she would "let the police know" that the defendant had not taken the car and that she had made a mistake. When the defendant did not arrive within the time allotted, Mr. Lane suggested that the victim try to call the defendant, but the number actually belonged to an Office Max. The person who answered the phone confirmed that the defendant "'came in to use the phone, and he told me that he had to call his boss and tell his boss he was running a little bit late at work.'" At that point, the Lanes reported the theft to the V.A. Hospital police and the "city police."

Two days later, Memphis Police Department ("MPD") officers responded to a call of a domestic disturbance at the Tanglewood Street residence that the defendant shared with his father and his sister, Walteria Shegog. Apparently, the defendant telephoned the police after his sister "threw a cookie at him." Ms. Shegog told the police that on September 17, 2012, the defendant "left walking; and when he came back, he was in a car – a silver Mustang." Although the defendant had left before the police arrived, he came walking up the street as Ms. Shegog spoke with them. After officers learned that the Mustang had been reported stolen, they detained the defendant and searched his

pockets, where they found the keys to the Mustang. They placed the defendant under arrest at that time.

That same day, the victim went to the police station and identified the defendant from a photographic lineup. Officers then told her that her car had been impounded. When she went to collect it, the car had a different license plate. She said that the Kelly Blue Book value of the car was $12,999.00 and that she had advertised the car for $12,000.00. She sold the car on the following Saturday for $10,000.00.

The 60-year-old defendant testified that he went to the V.A. Hospital on September 17, 2012, to see his doctor and that as he sat outside, he saw the victim's Mustang sitting in the parking lot with a "for sale" sign in the window. He said that he telephoned the victim and asked to look at the car, but he denied providing a false name or telling the victim that he worked at the V.A. Hospital. The defendant said that he asked the victim if he could take a test drive, and she agreed. He claimed that he initially wanted to take the car "to the freeway to take it on a spin" but that, when it began to rain, he decided to go to the Office Max to make flyers for his "own little business." He said that he tried to telephone the victim from his cellular telephone, but the battery was low, so he asked to use the telephone at Office Max. When he learned that the victim had already telephoned the police, he panicked because he had been previously convicted of several felonies and because he had seen "police association" stickers on the car. At that point, he drove the car to his father's house and parked the car down the street "in front of the state trooper's house" and "put the keys inside of the console of that vehicle." He said that it was his hope that the "trooper" would discover the car and return it to the victim. He insisted that he did not intend to steal the car, saying that he did not "mess with women and children and ill people." The defendant denied having the keys to the Mustang in his pocket at the time of the arrest and insisted that he did not alter the appearance of the car in any way.

Based upon this proof, the jury convicted the defendant of the lesser included offense of theft of property valued at $1,000 or more but less than $10,000. The trial court sentenced the defendant, a career offender, to 12 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court lacked territorial jurisdiction of his offense, that the trial court erred by permitting the State to impeach the defendant using convictions that were more than 10 years old, and that the trial court should have dismissed the indictment, or at least provided a jury instruction, based upon the State's loss or destruction of evidence.

-3-

## I. Jurisdiction

The defendant, citing 38 U.S.C. § 902, contends that the Shelby County Criminal Court lacked territorial jurisdiction in his case because the offense occurred in the parking lot of the V.A. Hospital, which, he contends, was under the exclusive control of the federal government. The State argues that the State had concurrent jurisdiction of the offense that occurred in the V.A. Hospital parking lot and that, in any event, the defendant's exercising control of the victim's vehicle continued into Shelby County beyond the parking lot, thereby vesting the Shelby County Criminal Court with jurisdiction.

Prior to trial, the defendant moved the trial court to dismiss the indictment, arguing that because the offense occurred in the V.A. Hospital parking lot, the federal government had exclusive territorial jurisdiction of the offense. He did not present any proof to support his claim, arguing only, "I would say that it's the V.A. parking lot. . . . I haven't heard an argument from the state that it's not V.A. property, so I don't even know if that's the issue." The State asserted that the defendant, as alleged in the indictment, exercised control over the victim's vehicle in Shelby County. The trial court denied the defendant's motion, concluding that the offense was a continuing offense.

Initially, we note that the defendant did not present any proof to support his claim that the parking lot of the V.A. Hospital was federal property such that the federal government had exclusive jurisdiction of any offense committed there. *See Massengale v. Mills*, 826 S.W.2d 122, 123 (Tenn. Crim. App. 1991) ("The burden is on the appellant to show that the federal government had exclusive jurisdiction where the evidence does not clearly show the offense was committed on land reserved exclusively to the U.S. Government."). Additionally, the statute cited by the defendant, 38 U.S.C. § 902, does not discuss the territorial jurisdiction of crimes committed in the V.A. Hospital parking lot. That statute deals with the jurisdiction of police officers within the Veteran's Administration. Finally, although the initial taking of the victim's car occurred in the parking lot of the V.A. Hospital, that offense was consummated when the defendant exercised control over the car beyond the point at which the victim had given him permission to do so, such as when he pulled out of the parking lot and drove to the Office Max and then to his house with the intent to deprive the victim of the vehicle. *See State v. Legg*, 9 S.W.3d 111, 115 (Tenn. 1999). In consequence, the defendant is not entitled to relief on this issue.

## II. Defendant's Criminal Convictions

The defendant next contends that the trial court erred by permitting the State to impeach him with his criminal convictions that were more than 10 years old, in

violation of Tennessee Rule of Evidence 609. The State asserts that the trial court did not err because the defendant opened the door to the admission of evidence of his prior convictions by his testimony. In the alternative, the State argues that any error in the admission of the convictions was harmless.

During direct examination, the defendant testified that he had previously been convicted of a number of crimes but had never been to trial, saying, "I've always had something to do, and it was wrong, and I pled guilty." Upon questioning by the prosecutor, the defendant acknowledged having six prior convictions for theft of property but qualified his acknowledgment, explaining, "I think there were about two/three cases that ran together that I pled guilty for three years because, you know, up under Alford v. North Carolina because it was better for me to take the three years than . . . to go to trial on the case." On redirect, when asked to explain what he meant when he said that he had pleaded "up under Alford v. North Carolina," the defendant said that he had pleaded guilty to those offenses even though he was not guilty in exchange for a lesser sentence. The trial court then instructed the jury that the ruling in *North Carolina v. Alford*, 400 U.S. 25, 37 (1970), permitted an accused to plead guilty if he determined that it was in his best interests to do so, regardless of whether he actually was guilty of the offense. At that point, the State asked the court's permission to impeach the defendant with his remaining convictions, arguing that the defendant had opened the door to further impeachment by attempting to minimize his criminal record. The trial court agreed and allowed the State to impeach the defendant with his remaining convictions. The State asked the defendant about a number of prior convictions going back to 1989, some of which he acknowledged and some of which he claimed not to recall.

Subject to certain conditions for admissibility, Tennessee Rule of Evidence 609 authorizes the use of proof of a witness's prior convictions to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior conviction must be for a felony or a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). To be eligible as an impeaching conviction, a prior felony conviction need not involve dishonesty. When the witness to be impeached is the criminal defendant, the State must give notice prior to trial of its intent to utilize the conviction for impeachment purposes, Tenn. R. Evid. 609(a)(3), and upon request, the court must determine the admissibility of an eligible conviction by deciding whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues," *id.* In making this determination, "two criteria are especially relevant." *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). First, the court must "analyze the relevance the impeaching conviction has to the issue of credibility" and "explain [the relevance] on the record," *id.*, and second, it must, "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction,'" *id.* (quoting Cohen, Sheppeard, Paine, *Tennessee Law of Evidence* § 609.9 at 376 (3d ed. 1995)). If the conviction is remote, that is, if more than 10 years have

elapsed from the date of release from confinement or from the date of conviction if no confinement was involved, the prior conviction may be admissible when the adverse party gives advance notice of intent to use the conviction, and the court determines that in the interests of justice the conviction's probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 609(b). On appeal, the trial court's decision to admit prior convictions for impeachment purposes will be reversed only when it appears that the trial court abused its discretion. *See, e.g.*, *Mixon*, 983 S.W.2d at 674.

This court has observed that the value of impeachment evidence is increased when the credibility of the defendant as a witness is "an important issue" and concluded that when the defendant makes his credibility an important issue, such as by "denying any wrongdoing and asserting legitimate conduct," we are "not inclined to question the trial court's allowing . . . the convictions for the purpose of impeachment." *State v. Blevins*, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997). Here, the trial court initially ruled that the State would be permitted to impeach the defendant with six of his prior convictions. The defendant acknowledged the prior convictions, but he attempted to minimize their impact by noting that he had pleaded guilty under *North Carolina v. Alford*. When the defendant added during direct examination that he pleaded guilty under *Alford* to receive a lesser sentence even though he was not guilty, he opened the door to further impeachment. Under these circumstances, we find no abuse of discretion in the trial court's decisions regarding the defendant's prior convictions. Moreover, given the overwhelming evidence of the defendant's guilt, any error that might have occurred as a result of the trial court's ruling was harmless.

### III. Lost or Destroyed Evidence

Finally, the defendant argues that the trial court should have dismissed the indictment or, at the very least, provided a jury instruction based upon the State's loss or destruction of the video surveillance from the V.A. Hospital and the Office Max. The State contends that the trial court did not err because no proof suggested that the State lost or destroyed any evidence.

MPD Officer Otto Kiehl, who responded to the call from the V.A. police regarding the Lanes' stolen vehicle, testified at trial that he reviewed surveillance video from the V.A. Hospital and that no footage showed the suspect. Officer Kiehl also interviewed the clerk at the Office Max and watched surveillance footage of an African American man making a telephone call. Officer Kiehl stated that he did not collect the Office Max footage at that time "because the person who assisted me in watching it either was not authorized or knew how to make a physical copy of it."

In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (1999)). The court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, *Merriman*, 410 S.W.3d at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785. The supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917). To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure: "(1) [t]he degree of negligence involved; (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) [t]he sufficiency of the other evidence used at trial to support the conviction." *Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86. We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.*

at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

In this case, the defendant has failed to demonstrate what, if any, exculpatory evidence would have existed in the video surveillance. Although the defendant argues that "the videos could have had very exculpatory evidence on it [sic], and that could have been the reason as to why the videos are no longer available," absolutely no evidence in the record supports his assertion. Moreover, the defendant admitted that he got into the victim's car in the parking lot of the V.A. Hospital and that he drove it to the Office Max, where he made a telephone call to the victim. Under these circumstances, we conclude that the video surveillance footage from the two locations was not "constitutionally material evidence" and that, in consequence, the State had no duty to preserve it. *Merriman*, 410 S.W.3d at 785.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE